UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
JANE DOE, individually, and as mother and    )
next best friend of JOHN DOE, a minor,       )
                                             )
            Plaintiff,                       )
                                             )
      v.                                     )      Civil Action No. 10-11426-DJC
                                             )
CULTURAL CARE, INC.,                         )
d/b/a CULTURAL CARE AU PAIR,                 )
DORTE STROBEL, and                           )
MAUREEN MCDONNELL,                           )
                                             )
                                             )
            Defendants.                      )
_____)
```

## MEMORANDUM AND ORDER

**CASPER, J.**                                                        March 17, 2011

### I.     Introduction

Plaintiff Jane Doe ("Doe"), on behalf of herself and her son, brings this action against Cultural Care Center, Inc., d/b/a Cultural Care Au Pair ("Cultural Care"), and two of its employees, Dorte Strobel and Maureen McDonnell (collectively, "Defendants"), alleging negligence, gross negligence, fraud, fraudulent and deceptive business practices in violation of Massachusetts and Illinois law and negligent infliction of emotional distress. Defendants move for partial summary judgment with respect to certain counts of the amended complaint. For the reasons set forth below, Defendants' motion for partial summary judgment is GRANTED IN PART and DENIED IN PART.

### II.    Procedural History

1

On October 1, 2009, Doe filed a complaint in the United States District Court for the Northern District of Illinois against Defendants alleging negligence, fraud, intentional and negligent infliction of emotional distress and negligent hiring, supervision, and retention. On February 1, 2010, Defendant Cultural Care moved to dismiss for improper venue. On August 3, 2010, that district denied Defendant's motion to dismiss the action, but granted Defendants' alternative request to transfer the case to the United States District Court for the District of Massachusetts. After having been transferred to this Court, on September 30, 2010, Doe filed an amended complaint, alleging negligence (Count I), gross negligence (Count II), fraud (Count III), violation of the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505 *et seq.* (Count IV), violation of the Massachusetts Consumer Protection Act, M.G.L. c. 93A (Count V) and negligent infliction of emotional distress (Count VI). This Court has subject matter jurisdiction under 28 U.S.C. § 1332.

Defendants have now moved for summary judgment on Counts I, IV, V, and VI under Fed. R. Civ. P. 56. This matter was transferred to this session on February 3, 2011 and the Court heard oral argument on February 22, 2011.

### III. Factual Background

Based upon the Defendants' statement of material facts under Local Rule 56.1 and Doe's response to the same, the following facts are undisputed.

In or around October 2007, Doe wanted to engage an au pair to care for her child and contacted Cultural Care. Cultural Care is a United States designated exchange visitor program sponsor that enables international au pair candidates between eighteen and twenty-six years old to live in the United States and live with an American host family. The United States government provides the au pairs with temporary visas that allow them to provide childcare services for children

2

twelve to twenty-four months old.

To participate in the au pair service, Cultural Care required applicants, like Doe, to complete and execute various documents including the Host Family Application and the Host Family Agreement which contained a release provision (collectively, the "Host Family Documents"). The Host Family Documents were available on Cultural Care's website and could be completed electronically online or printed out and completed by hand. The first six pages or tabs of the Host Family Documents request, among other things, general information about the host family and the host family's preferences in an au pair. The seventh page contains the Agreement and the Host Family and Au Pair's Acknowledgment (the "Acknowledgment"). When the Host Family Documents are completed online, the Agreement is contained in a scroll box and the Acknowledgment appears just below the scroll box. The Acknowledgment required an applicant to select three checkboxes indicating she agreed to adhere to the United States Department of State regulation and Cultural Care program guidelines. An applicant then executes the Agreement by clicking on another checkbox. If the applicant does not agree to the terms of the Agreement, the applicant may select an alternate checkbox. By doing so, the applicant is not able to receive au pair services.

The Agreement contains a release provision that is anticipatory in nature. The Agreement states:

> 15. Host agrees that [Cultural Care] shall not be liable for and does not guarantee acceptable performance by the au pair. Host agrees that the au pair is not an employee, servant, or agent of [Cultural Care], and that [Cultural Care] does not exercise dominion or control over the actions of the au pair. [Cultural Care] is not responsible for any act or omission on the part of the au pair.

> 22. Host agrees to irrevocably, unconditionally, and fully remise, release

3

> and forever discharge [Cultural Care] and its affiliates; and said persons' respective officers, directors, successors, assigns, attorneys, insurance companies, agents, employees and affiliates, or others to the extent acting or purporting to act on the aforementioned persons' behalf (all of said persons hereinafter, in the aggregate, being referred to as "Released Parties"), from any and all claims or causes of action which Host has or may hereafter have, which arise out of injury, damage or loss of any other kind to the Host or their property resulting from participation in the Cultural Care Au Pair program. This includes, without limitation, the au pair's performance of services for and involvement with the host family, regardless of how such injury, damage or loss may arise and regardless of whether the injury, damage or loss is in whole or in part caused by the negligence of any one or more of the Released Parties. Host further agrees to indemnify and hold harmless the Released Parties from and against any losses, claims, damages, or liabilities related to or arising out of the participation of the Host in the Cultural Care Au Pair program, including (without limitation) any injury or damage to the Host that the au pair causes or to which s/he contributes, and any injury or damage to the au pair which Host causes or to which Host contributes.

Doe completed the Host Family Documents online. She selected the three required checkboxes that appeared on the Acknowledgment and executed the Agreement, including the release provision therein, by selecting another checkbox. An au pair was then placed in Doe's home to care for her son. Doe now alleges that, between the end of November and mid-December 2007, the au pair sexually abused her son.

On or about November 30, 2007, Doe complained about Julian's conduct and informed Cultural Care that she no longer wished to host him. By December 11, 2007, Cultural Care had matched Doe with another au pair who began employment with the Doe family in mid-December 2007, but was discharged once Doe discovered that the first au pair had sexually abused her son.

**IV. Discussion**

In a diversity action, the choice-of-law rules that apply are those of the forum state, in this

4

case Massachusetts. Klaxon v. Stenton Electric Mfg. Co., 313 U.S. 487, 496 (1941). When in a diversity action, "all parties cite to Massachusetts case law to support their claims. . . [the] Court need inquire no further into choice of law." Merchants Ins. Grp. v. Mr. Cesspool, LLC, 2010 WL 2836859, at *3 n. 6 (D. Mass. July 19, 2010) (quoting Peabody Essex Museum, Inc., v. U.S. Fire Ins. Co., 623 F. Supp. 2d 98, 106 (D. Mass. 2009). As the parties here cite to Massachusetts law for the negligence and 93A claims in their briefs to this Court and do not dispute that Massachusetts law applies, this Court will forego an independent analysis of the choice of law issue and apply Massachusetts law. McAdams v. Massachusetts Mut. Life Ins. Co., 391 F.3d 287, 298 n. 5 (1st Cir. 2004).[1]

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the undisputed facts show that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "An issue is genuine if the evidence of record permits a rational factfinder to resolve it in favor of either party." Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4-5 (1st Cir. 2010) (internal quotations and citations omitted). "A fact is material if its existence or nonexistence has the potential to change the outcome of the suit. Id. The moving party bears the burden of showing the district court the basis for its motion and identifying where there exists a lack of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

"Once the moving party has accomplished this feat, the burden shifts to the nonmoving party, who must, with respect to each issue on which she would bear the burden of proof at trial, to

---

[1] See infra, Part IV.C., for choice-of-law analysis with respect to Doe's claim under the Illinois Consumer Fraud and Deceptive Business Practices Act.

5

demonstrate that a trier of fact could reasonably resolve that issue in the her favor." Borges, 605 F.3d at 5 (citing Celotex, 477 U.S. at 324). "If the nonmovant fails to make this showing, then summary judgment is appropriate." Id. "Unsupported allegations and speculation do not demonstrate either entitlement to summary judgment or the existence of a genuine issue of material fact sufficient to defeat summary judgment." Rivera-Colon v. Mills, __ F.3d __, 2011 WL 504049, at *2 (1st Cir. Feb. 15, 2011). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995).

### A. Validity of the Release

Defendants argue that the Agreement and Release releases the Defendants from claims alleged in Counts I, IV, V, and VI based on their own negligence or the actions of the au pair. "Massachusetts law favors the enforcement of releases." Sharon v. City of Newton, 437 Mass. 99, 105 (2002). "It is well established . . . [that] in the absence of fraud a person may make a valid contract exempting himself from any liability to another which he may in the future incur as a result of his negligence or that of his agents or employees acting on his behalf." Tran-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008) (internal citations omitted). "Whether such contracts be called releases, covenants not to sue, or indemnification agreements, they represent a practice [Massachusetts] courts have long found acceptable." Sharon, 437 Mass. at 105.

It is undisputed that Doe executed the Agreement and Release.[2] The plain language

---

[2]There is no dispute that Doe electronically signed the Agreement and Release and that online and electronic signatures are valid. See M.G.L. c. 110G, §§ 7, 9, 13. M.G.L. c. 110G, § 7 provides: "(a) A record or signature may not be denied legal effect or enforceability solely because it is in electronic form. (b) A contract may not be denied legal effect or enforceability solely because an electronic record was used in its formation. (c) If a law requires a record to be

6

contained in paragraphs 15 and 22 is clear and comprehensive. Paragraph 15 provides that "[Cultural Care] shall not be liable for . . . the au pair [and] [Cultural Care] is not responsible for any act or omission on the part of the au pair." Paragraph 22 of the Agreement specifically states that the "Host agrees to . . . unconditionally . . . release and forever discharge [Cultural Care] and its . . . agents, employees . . . from any and all claims . . . which Host has or may hereafter have, which arise out of injury, damage, or loss . . . [including] without limitation, the au pair's performance of services for and involvement with the host family, regardless of how such injury, damage, or loss may arise and regardless of whether the injury, damage, or loss is in whole or in part caused by the negligence of any one or more of the Released Parties." Paragraph 22 also contains an express indemnification clause whereby the "Host [ ] agrees to indemnify and hold harmless the Released Parties from and against any losses . . . including (without limitation) any injury or damage to the Host that the au pair causes. . . ." The language contained in paragraphs 15 and 22 expressly releases the Defendants from liability for damage caused by ordinary negligence. Massachusetts courts have held that releases and indemnification provisions with language similar to the language here bar ordinary negligence claims. See, e.g., Cormier v. Central Massachusetts Chapter of Nat'l Safety Council, 416 Mass. 286, 287-88 (1993); Vallone v. Donna, 49 Mass. App. Ct. 330, 331, 333 (2000); Vokes ex rel. Vokes v. Ski Ward, Inc., No. 032313B, 2005 WL 2009959, at *1 (Mass. Super. Ct. July 5, 2005).

### 1. Doe's Allegations of Fraud Do Not Render Waiver Unenforceable

"When a release is raised in defense of such a claim, the plaintiff bears the burden of proving

---

in writing, an electronic record satisfies the law. (d) If a law requires a signature, an electronic signature satisfies the law."

that it is not a valid bar to her suit." Sharon, 437 Mass. at 103 n.6 (citing Gannett v. Lowell, 16 Mass. App. Ct. 325, 327 (1983)). To that end, Doe argues that the release does not bar her claims against Defendants because the release was procured by fraud, and alleges that as a result, the release is invalid.

Courts have invalidated liability releases on the basis of fraud where a party misrepresented or concealed the terms of the release. See, e.g.; King v. Motor Mart Garage Co., 336 Mass. 422, 426 (1957); Kean v. New York Cent. & H.R.R. Co., 210 Mass. 449, 452-53 (1912). As the Supreme Judicial Court has stated, "[i]n the absence of any concealment of or false representations as to the *contents* of [a] release it could be ruled as a matter of law that the release was not procured by fraud." Lee v. Allied Sports Assocs., Inc., 349 Mass. 544, 551 (1965) (emphasis added); accord Gillespie v. Papale, 541 F. Supp. 1042, 1045 (D. Mass. 1982).

Doe's allegations of fraud, which are disputed by Cultural Care, involve issues distinct from the contents of the Agreement and Release. Doe claims that shortly after the au pair's employment began, he told Doe that he had been dismissed by three prior host families - information Cultural Care did not disclose to Doe prior to her executing the Agreement. Doe discovered that the au pair was entertaining friends and having parties at her home, and that contrary to Strobel's assertions that he neither smoked nor drank, the au pair and his friends were smoking and drinking. Doe further discovered that he was not enrolled in a graduate program. Doe claims that if she knew the au pair drank, smoked and had been dismissed by three prior host families, she would have read the Agreement and would not have executed it. Even accepting these allegations as true, Doe presents no evidence showing that Defendants concealed or misrepresented the terms of the Agreement itself. Nor has Doe presented any legal basis for her contention that misrepresentations distinct from a

contract's terms amounts to fraudulent inducement.

The fact that Doe did not take the time to read the terms and conditions of the Agreement because she felt hurried by Strobel does not change the analysis. Doe does not dispute that she executed the Agreement or that it contains the Release. She disputes that she agreed to the terms and conditions, that the Release discharges Defendants from liability or bars her claims since she had no knowledge of the Release and was rushed into executing the Agreement based on Defendants' representations. Doe claims that she was rushed into completing the information on Cultural Care's website by Strobel who repeatedly told her that if she did not quickly complete the application, it would take months before Cultural Care could find another au pair. She remembers clicking the "accept" button, but does not remember seeing any terms of the Agreement before doing so.

"It is a rule in this Commonwealth that the failure to read or to understand the contents of a release, in the absence of fraud or duress, does not avoid its effects." Sharon, 437 Mass. at 103 (quoting Lee, 349 Mass. at 550-51). In Sharon, the Supreme Judicial Court upheld a release signed by plaintiff as a prerequisite to her participation in cheerleading. 437 Mass. at 103, 106-107. The Court found that by signing the release, the plaintiff and her father were "deemed to have understood it" despite plaintiff's contention that she nor her father realized that by signing it, they were waiving future claims against the defendant. Id. at 103.

Although rushed, Doe had the opportunity to read the document, but she did not. See Cormier, 416 Mass. at 289 (holding plaintiff was deemed to have understood the release she signed because she had the opportunity to read it). Doe's concern that she would have needed to wait six months for another au pair does not excuse Doe from her obligation to read the Agreement she

9

signed.  Schell v. Ford Motor Co., 270 F.2d 384, 386 (1st Cir. 1959).  Thus, having allegedly been rushed into executing the release and having admittedly not read the terms of the release is not material to whether the release is enforceable in the absence of any misrepresentations about the release.

### 2. Public Policy Does Not Warrant that the Release Be Unenforceable

Doe also argues that enforcement of the release against her claims would constitute a violation of public policy, advancing two public policy contentions: first, that child care services implicate public policy concerns because it is an essential service; second, that enforcing the release would shield Defendants from responsibility for violation of a statutory duty.

First, Doe contends that the release here is unenforceable, even in the absence of fraud because the release involves child care services.  In Sharon, the Court noted that it had "not had the occasion to rule on the validity of releases required in the context of a compelled activity or as a condition for the receipt of essential services (e.g., public education, medical attention, housing, public utilities), and the enforceability of mandatory releases in such circumstances might well offend public policy." 437 Mass. at 106.  Citing to this language, Doe argues that child care services is an "essential" service for working parents and thus implicates public policy concerns not present in Sharon.  However, Doe cites no authority, nor is this Court aware of any such authority, that a mandatory release in connection with the provision of au pair services is an essential service in the manner suggested by Sharon.  Moreover, although the au pair may have been critical to Doe's work arrangements, this Court cannot say that this service is on par with the illustrative examples of "essential services" given by the Supreme Judicial Court in that case.

Second, Doe argues that enforcing the release would shield Defendants from responsibility

for violation of their "statutory duty" under 22 C.F.R. § 62.31, au pair federal regulations and, therefore, the Court's enforcement of the release violates public policy. Doe, however, does not satisfactorily explain how the enforcement of the release would work to do so. In support of her argument, Doe relies on Zavras v. Capeway Rovers Motorcycle Club, Inc., 44 Mass.App.Ct. 17, 19 (1997), which cites to Henry v. Mansfield Beauty Academy, Inc., 353 Mass. 507, 511 (1968) for the proposition that courts may decline to enforce releases "e.g., where a release attempts to shield defendant from responsibility for violation of a statutory duty." Id. However, Henry is inapposite to the instant case. In Henry, the plaintiff, who had signed a release, sustained injuries while receiving services at a beauty school. 353 Mass. at 510. The Supreme Judicial Court held that the beauty school lost the protection from liability under the release based on the conclusion of the lower court that the beauty school violated a statute requiring the registration of all its students. Id. at 510-11. Although Doe alleges a statutory violation here, there has been no finding of such a violation.

Even if, as Doe alleges, the Defendants have failed to fulfill its duties under the regulations in regard to the selection and screening of au pairs, see 22 C.F.R. §§ 62.31(d)(6) (regarding successful completion of a background check), (l) (regarding obligation to "fully monitor all au pair exchanges") and (g)(1) (requiring that an au pair receive child safety instruction prior to being placed with a host family), nothing about enforcing the otherwise enforceable waiver of any negligence claims would bar the State Department from investigating the Defendants for same or imposing sanctions for same.[3] That is, it cannot be said that enforcing a waiver of Doe's negligence

---

[3] "In addition to [other sanctions], the Department of State may undertake immediate program revocation procedures upon documented evidence that a sponsor has failed to . . . satisfy the selection requirements for each individual au pair as set forth in paragraph (d)

11

claims violates public policy by thwarting any governmental accountability for Cultural Care's actions. Thus, the Court finds that the waiver is valid and enforceable as against Count I. Because the negligent infliction of emotional distress claim (Count VI) is also grounded in negligence, see Payton v. Abbott Labs, 386 Mass. 540, 552 (1982), the waiver also bars that claim.

Accordingly, the Court finds that the waiver is valid and enforceable as against Counts I and VI. Cultural Care is entitled to judgment as a matter of law on those counts.

### B. M.G.L. c. 93A

Whether the release is enforceable against Doe's claims of unfair and deceptive business practices under M.G.L. c. 93A is a closer question. Section 9 of Chapter 93A provides a private cause of action for "any person ... who has been injured by another person's use or employment of" an unfair or deceptive act or practice. Mass. Gen. Laws ch. 93A, § 9 (2004). "A practice is unfair if it is within ... the penumbra of some common-law, statutory, or other established concept of unfairness; ... is immoral, unethical, oppressive, or unscrupulous...." Blue Hills Office Park LLC v. J.P. Morgan Chase Bank, 477 F. Supp. 2d 366, 376 (D. Mass. 2007) (internal citations and quotations omitted).

The only case that the Defendants rely upon for their argument that the waiver releases them from liability for the 93A claim is Haggerty v. Tokio Fire & Marine Insur. Co., Ltd., No. 98-P-2360, 2001 WL 315361 (Mass. App. Ct. Mar. 14, 2001), an unpublished opinion of the Massachusetts Appeals Court. Defendants' reliance on Haggerty for the proposition that a broad release in a contract applies to c. 93A claims is misplaced. In Haggerty, the release was part of a settlement

---

[passing a background investigation, criminal background check and personality profile] . . . ."
22 C.F.R.
§ 62.31(n).

agreement which applied to retrospective claims arising out of a car accident. 2001 WL 315361 at *1-2. The Court found that the release and contract barred Plaintiff's 93A claim in connection with the accident. Id. at *2. In the instant case, as Doe correctly asserts, the release applies to anticipatory claims unknown at the time the Agreement was executed.

The Supreme Judicial Court has held that although a contractual waiver of statutory rights may be permissible, for example, where the statute's purpose is to protect individual property rights rather than the general public, "[a] statutory right may not be disclaimed if the waiver would do violence to the public policy underlying the legislative enactment." Canal Elec. Co. v. Westinghouse Elec. Corp., 406 Mass. 369, 378 (1990) (internal citations omitted). Indeed, "in various circumstances, courts have long refused to give effect to purported waivers of statutory rights where enforcement of the particular waiver would do violence to the public policy underlying the legislative enactment." Spence v. Reeder, 382 Mass. 398, 413 (1981) (collecting cases); First Mut. Inc., v. Rive Gauche Apparel Distrib., Ltd., No. 90-10899-Z, 1990 WL 235422, at *3 (D. Mass. Dec. 21, 1990) (noting that "Massachusetts Courts have held that a party may waive its rights under c. 93A if that waiver would not frustrate the public policies underlying the statute") (citing Canal, 406 Mass. at 377).

Although there is no steadfast rule with respect to enforceability of such waivers, courts are less likely to enforce contractual waivers to liability under 93A arising out of disputes involving a consumer as opposed to two commercial entities for public policy reasons. The "primary goal" of c. 93A is the "protection of consumers." V.S.H. Realty, Inc. v. Texaco, Inc., 757 F.2d 411, 416 (1st Cir. 1985). The First Circuit has explained that, "[M.G.L. c. 93A] § 9 was adopted . . . to provide an effective private remedy to consumers . . . § 11 was adopted . . . to eliminate anticompetitive

13

activity . . . Given their different origins and purposes, what is waivable under one section might not be waivable under the other." Anderson, 500 F.3d at 76, 77 (holding that the four-year statute of limitations for consumers provided by legislature for c. 93A claims was not waivable by consumer plaintiff in his agreement with Comcast providing for a one-year statute of limitations period) (internal citations omitted). The Supreme Judicial Court has also stated that it "ordinarily would not effectuate a consumer's waiver of rights under c. 93A." Canal, 406 Mass. at 378. "This . . . language hint[s] that waiver of statutory remedies will not be allowed in situations involving a consumer plaintiff . . ." Kristian v. Comcast, Corp., 446 F.3d 25, 50 (1st Cir. 2006).

Courts are more likely to enforce contractual waivers of 93A liability where such claims are duplicative of a plaintiff's breach of contract claim and do not offend public policy. Canal, 406 Mass. at 378 (holding that a limitation of liability provision in a commercial contract which limited remedies to actual damages under the claim for breach of warranty could bar recovery for a claim under c. 93A arising from breach of contract if it is "duplicative of a traditional contract claim"); First Mut., 1990 WL 235422, at *3 (holding that "where the dispute is essentially a private one arising between two commercial entities, and where the 93A claims merely supplement private claims, a party may waive its rights under 93A by contract"); Physician Ins. Agency of Massachusetts, Inc. v. Investors Capital Holdings, Ltd., No. 0303597, 2005 WL 3722373, at *3 (Mass. Super. Ct. Dec. 30, 2005) (holding 93A claim was barred because it was "nothing more than a dressed up breach of contract claim to which [plaintiff] waived its right to recovery" and did not violate public policy while rejecting that the 93A claim was a "tort/contract" mix because plaintiff "withdrew its intentional and reckless misrepresentation claims prior to trial"). This is so, as the Supreme Judicial Court explained, because the legislature did not intend in 93A to "authorize

14

cumulative damages ... for the same wrong," where a 93A claim is simply an alternative theory of recovery under the contract. Canal, 406 Mass. at 379 (quoting McGrath v. Mishara, 386 Mass. 74, 85 (1982)).

First, there is no breach of contract claim alleged by Doe here and so it cannot be said that her c. 93A claim is duplicative of a traditional breach of contract claim. Second, and most significantly, there are strong public policy reasons for refusing to enforce a 93A waiver here. Doe's 93A claim is mainly grounded in Defendants' alleged fraudulent representations and practices. "Actions involving fraudulent representations in knowing disregard of the truth encompass culpable, willful behavior under [93A]." Datacomm Interfact, Inc., v. Computerworld, Inc. et al., 396 Mass. 760, 780 (1986) (internal quotation marks omitted). The types of fraudulent representations allegedly made to Doe here, if true, are well within the bounds of conduct found actionable under 93A. See, e.g., Briggs v. Carol Cars, Inc., 407 Mass. 391, 396-397, 553 N.E.2d 930 (1990); Homsi v. C.H. Babb Co., 10 Mass.App.Ct. 474, 478 (1980); Holbrook v. Daniels, No. CA 893555B, 1995 WL 808711, at *3-4 (Mass. Super. Ct. Mar. 1, 1995).

Courts applying Massachusetts law have more than suggested that enforcing a waiver of a consumer plaintiff's claim under a statute such as c. 93A would be contrary to public policy. See Anderson, 500 F.3d at 76-77; Kristian, 446 F.3d at 50; Canal, 406 Mass. at 378; see also Feeney v. Dell Inc., 454 Mass. 192, 193, 199-202 (2009). Rendering the waiver unenforceable as violating public policy is especially appropriate in the instant case where Doe alleges consumer fraud in connection with the placement of an au pair in her home whom she alleges abused her son. Accordingly, the release does not preclude Plaintiff's 93A claim.

C. **Illinois Consumer Protection Statute**

Defendants argue that the choice of Massachusetts law provision in the Agreement, that the Agreement "shall be governed by the laws of the Commonwealth of Massachusetts, without regard to the conflict of law principles of Massachusetts or any other jurisdiction," precludes Doe from suing under the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois Act"), 815 ILCS § 505/1 *et seq*. The Court rejects this argument since the parties' choice of law provision governing the Agreement does not answer whether Doe may bring a claim for fraudulent and deceptive practices against Defendants arising under Illinois law.

Although the parties implicitly agree, as discussed above, that Massachusetts law applies to the negligence and 93A claims, the parties have neither explicitly nor implicitly agreed that Massachusetts law applies to Doe's claim under the Illinois Act. Thus, the first step in determining whether Doe's claim under the Illinois Act is waived by the release in the Agreement is resolving the proper choice-of-law. That is, whether the Court should rely on the substantive law of Massachusetts when analyzing whether the waiver relieves Cultural Care of liability for a claim under the Illinois Act or whether, the substantive law of Illinois ought to apply instead. Under Massachusetts choice-of-law rules, the Court employs a "functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole." Bushkin Assocs., Inc. v. Raytheon Co., 393 Mass. 622, 631 (1985). Massachusetts choice-of-law analysis is guided by the RESTATEMENT (SECOND) OF CONFLICT OF LAW § 148(2) (1971). Id. at 632.

Here, while Cultural Care's place of business is in Massachusetts and Cultural Care made its representations in Massachusetts over the phone to Doe in Illinois, the balance of the factors in this analysis slightly tips in favor of Illinois law. Specifically, the place where Doe acted in reliance upon Cultural Care's representations by executing the Agreement on Cultural Care's website and

16

the place where Doe was exposed to Cultural Care's representations both occurred in Illinois. The effect of the alleged misrepresentation whereby the au pair was placed in Doe's home and allegedly abused her son was also felt in Illinois, not in Massachusetts. Moreover, given Doe's citizenship, Illinois has a strong interest in applying its own laws to protect its consumers.

Applying Illinois law to determine whether the waiver in the Agreement should preclude Doe from raising her claim under the Illinois Act, the Court concludes that the release does not bar Plaintiff's claim.[4] Under Illinois law, exculpatory clauses or releases which relieve a defendant of liability are "not favored," are "strictly construed and must have clear, explicit, and unequivocal language showing that it was the intent of the parties." Zimmerman v. Northfield Real Estate, Inc., 156 Ill. App. 3d 154, 164-65 (1986); Scott & Fetzer Co. v. Montgomery Ward & Co., 112 Ill. 2d 378, 395 (1986) (releases are strictly construed against the benefitting party and "must spell out the intention of the parties with great particularity"). Illinois courts have uniformly held that releases shielding a defendant from liability for fraud or willful and wanton misconduct are not enforceable. See InQuote Corp. v. Cole, No. 99 c 6232, 2000 WL 1222211, at *3-4 (N.D. Ill. Aug. 24, 2000) (holding that limitation of liability clause in agreement did not preclude fraud claim and stating "exculpatory agreements cannot insulate a party against responsibility for fraud"); Time Warner Sports Merchandising v. Chicagoland Processing Corp., 974 F. Supp. 1163, 1175 (N.D. Ill. 1997) ("exculpatory clauses are not enforceable to insulate a party against responsibility for its own intentional torts - most particularly fraud"); see also Kleinwort Benson North America, Inc. v. Quantum Fin. Servs., Inc., 285 Ill. App. 3d 201, 216 (1996); Zimmerman, 156 Ill. App. 3d at 164-65.

---

[4]Even if Massachusetts law were to apply to this claim, for the reasons discussed supra, in Section IV.B., the result would be the same.

Here, enforcing the release would effectively shield Cultural Care from liability for fraud since Doe's claim under the Illinois Act is grounded in Cultural Care's alleged fraudulent representations and practices with respect to the au pair placed in her home. Accordingly, the release does not preclude Doe's claim under the Illinois Act.

**V.      Conclusion**

For the foregoing reasons, summary judgment in favor of Cultural Care on Counts I and VI is GRANTED. Summary judgment as to Counts IV and V is DENIED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge