# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
**JANE DOE, individually, and as mother and**  )
**next best friend of JOHN DOE, a minor,**  )
  )
    **Plaintiff,**  )
  )
    **v.**  )    **Civil Action No. 10-11426-DJC**
  )
**CULTURAL CARE, INC.,**  )
**d/b/a CULTURAL CARE AU PAIR,**  )
**DORTE STROBEL, and**  )
**MAUREEN MCDONNELL,**  )
  )
    **Defendants.**  )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                             October 7, 2011

## I.    Introduction

Plaintiff Jane Doe ("Doe"), on behalf of herself and her son, John Doe, brings this action against Cultural Care Center, Inc., d/b/a Cultural Care Au Pair ("Cultural Care"), and two of its employees, Dorte Strobel and Maureen McDonnell (collectively, "Defendants"), alleging negligence, gross negligence, fraud, fraudulent and deceptive business practices in violation of Massachusetts and Illinois law as well as negligent and intentional infliction of emotional distress. The Court previously dismissed the negligence and negligent infliction of emotional distress claims. Defendants now move for summary judgment on the remaining counts. For the reasons set forth below, Defendants' motion for summary judgment is GRANTED.

1

II.     **Burden of Proof and Standard of Review**

Summary judgment is appropriate where there is no genuine dispute as to any material fact and the undisputed facts show that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The moving party bears the burden of showing the Court the basis for its motion and identifying where there is a lack of any genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "Once the moving party has accomplished this feat, the burden shifts to the nonmoving party, who must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor."  <u>Borges ex. rel. S.M.B.W. v. Serrano-Isern</u>, 605 F.3d 1, 5 (1st Cir. 2010) (citing <u>Celotex</u>, 477 U.S. at 324).  "If the nonmovant fails to make this showing, then summary judgment is appropriate."  <u>Id.</u>  The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." <u>Barbour v. Dynamics Research Corp.</u>, 63 F.3d 32, 37 (1st Cir. 1995).  However, disputes over facts that are not material to the issues raised will not defeat a motion for summary judgment.  <u>Anderson</u>, 477 U.S. at 248.

III.    **Factual Background**

Based upon the Defendants' statement of material facts under Local Rule 56.1 and Doe's responses to same, the following facts are undisputed unless otherwise noted.

In October 2007, Doe sought to engage an au pair to care for her son and contacted Cultural Care.  (Pl. Resp. Statement of Facts ¶ 4).[1]  Cultural Care is a United States designated exchange

---

[1] For the purposes of this Memorandum and Order, the parties' filings referenced herein shall be abbreviated as follows:   Doe's amended complaint ("Am. Compl."); Defendants' motion for summary judgment ("Def. Mot."); Defendants' memorandum of law in support of

visitor program sponsor that enables international au pair candidates between eighteen and twenty-six years old to live in the United States with an American host family.   (Pl. Resp. Statement of Facts ¶¶ 1, 3).  The United States government provides the au pairs with temporary visas that allow them to provide childcare services for a period of twelve to twenty-four months.  (Pl. Resp. Statement of Facts ¶ 2).

On October 19, 2007, Doe spoke with the Cultural Care Au Pair Placement Manager, Dorte Strobel ("Strobel"), by phone concerning an au pair placement for her son.   (Pl. Resp. Statement of Facts ¶ 4).  Strobel informed Doe that an au pair named Julian Reyes ("Reyes") was available. Strobel told Doe that Reyes was leaving his prior host family because he was being overworked and the host family wanted someone with more experience with young children.  (Pl. Statement of Add. Facts ¶ 7; Doe Decl. ¶ 6).  Following this conversation, Doe selected Reyes to serve as an au pair to care for her son.  (Pl. Resp. Statement of Facts ¶ 5).   Shortly after Reyes began living with Doe and her son on October 21, 2007, (Pl. Resp. Statement of Facts ¶¶ 6), Doe discovered that Reyes had been dismissed by two prior host families; he was with the first host family from on or around March 1, 2007 to May 29, 2007 and with the second host family from on or around June 1, 2007 to October 18, 2007.  (Pl. Resp. Statement of Facts ¶ 8).

---

their motion for summary judgment ("Def. Memo"); Defendants' statement of material facts ("Def. Statement of Facts"); Doe's response to Defendants' statement of material facts ("Pl. Resp. to Def. Statement of Facts"); Doe's statement of additional material facts ("Pl. Statement of Add. Facts"); Doe's declaration, dated December 30, 2010 ("Doe Decl."); Doe's answer to Strobel's interrogatories attached as Exhibit 6 to Defendants' motion for summary judgment ("Pl. Ans. to Strobel's Int."); Doe's answer to Cultural Care's interrogatories attached as Exhibit 6 to Defendants' motion for summary judgment ("Pl. Ans. to Cultural Care Int."); Doe's opposition to Defendants' motion for summary judgment ("Pl. Opp."); Doe's deposition transcript attached as Exhibit 7 to Defendants' motion for summary judgment ("Doe Tr."); and the transcript of the motion hearing ("Hearing Tr.").

According to the Exit Interview from Reyes' placement with the first host family, the family listed the following concerns: "relationship with son - want more interaction, less teasing.  Too quiet, be more of a family member."  (Pl. Resp. Statement of Facts ¶ 9).  The second host family listed the following concerns in its Exit Interview from Reyes' placement: "[Host mom] feels [au pair] is immature and does not nurture the kids. [Au pair] works 30 hrs./week and has a car yet doesn't help w/kids' clean-up, etc."  (Pl. Resp. Statement of Facts ¶ 10).  Upon his departure from the second host family, Reyes indicated the following concerns about his placement there:  "Feels kids didn't mesh with him and may have problems managing the kids (meals, playtime)."  (Pl. Resp. Statement of Facts ¶ 11).

Doe also later discovered that Reyes was a smoker and drinker, contrary to Strobel's assertions that he neither smoked nor drank.   (Pl. Statement of Add. Facts ¶¶ 13, 15).  Approximately two weeks after Reyes' employment began with the Doe family, on October 30, 2007, Doe spoke with Heather Parris ("Parris"), Cultural Care's Local Care Coordinator.  (Pl. Ans. to Strobel's Int. ¶ 13).  When Doe informed Parris that Reyes smoked and drank, Parris asked Doe to give her a few days to speak with Reyes.  (Pl. Ans. to Strobel's Int. ¶ 13).   On November 3, 2007, Doe told Parris that she wanted Reyes out of her home because she could smell cigarette smoke in the house when she came home from work.  (Pl. Statement of Add. Facts ¶ 15; Pl. Ans. to Strobel's Int. ¶ 13).  Parris explained that she had to allow for a four-week transition period to find a new family for Reyes.  (Pl. Ans. to Strobel's Int. ¶ 13).  Parris also requested that Doe give her some time to work with Reyes.  (Pl. Ans. to Strobel's Int. ¶ 13).

On November 28, 2007, Parris conducted an interview with Doe during which she listed the following concerns about her au pair:  "concerned about Reyes' maturity level and wondering if

child is getting fed." (Pl. Resp. Statement of Facts ¶ 12). Two days later, Doe informed Cultural Care's Program Director Maureen McDonnell that she wanted to terminate Reyes as her au pair and McDonnell informed Doe that a two-week transition period would begin at that point and that during this two-week period, Doe was required to house Reyes but was not required to use him for childcare services. (Pl. Resp. Statement of Facts ¶ 13). On December 3, 2007, Doe called to inform Strobel that Reyes told her son, John Doe, that he was going to kill himself. (Pl. Statement of Add. Facts ¶ 18; Strobel Tr. 83-84). Strobel testified that she was not trained to handle such situation and therefore referred the situation to McDonnell. (Pl. Statement of Add. Facts ¶ 18; Strobel Tr. 84). Seven days later, on December 10, 2007, John Doe called Doe after school while he was home alone with Reyes and asked her to return home. (Pl. Statement of Add. Facts ¶ 19; Doe Tr. 111). Upon Doe's arrival, John Doe told her that "Reyes hurt [him] really bad" and although John Doe did not provide further details at the time, Doe recalled that her son was scared. (Pl. Statement of Add. Facts ¶ 19; Doe Tr. 107). The next day, Doe brought Reyes to Parris' home. (Pl. Resp. to Statement of Facts ¶ 14; Pl. Statement of Add. Facts ¶ 20; Doe Tr. 109). The following day, on December 12, 2007, John Doe told his mother that Reyes had taken nude pictures of him and touched his penis. (Pl. Resp. Statement of Facts ¶ 15; Doe Tr. 113-14).

Doe reported to the Lockport, Illinois Police Department ("police department") that she suspected Reyes had sexually abused her son. (Pl. Resp. Statement of Facts ¶ 16). A police officer and two police detectives interviewed Doe regarding the alleged abuse. (Pl. Resp. Statement of Facts ¶¶ 17, 18). Reyes consented to the police department's search of his cell phones, digital camera and laptop computer. (Pl. Resp. Statement of Facts ¶ 19). A detective from the police department informed Doe that the examination of Reyes' digital camera, cell phone and laptop

computer revealed no nude photographs or inappropriate photographs of John Doe or Reyes.  (Pl. Resp. Statement of Facts ¶¶ 19, 21).  To Doe's knowledge, no nude photographs or inappropriate photographs of her son or of Reyes were ever found by the police department on Reyes' phone, camera or computer.  (Pl. Resp. Statement of Facts ¶ 22).  Doe sent physician reports of examinations of John Doe to the police department.  (Pl. Resp. Statement of Facts ¶ 23).  Kendall County Child Advocacy's Shelly Franklin interviewed Doe's son regarding the allegations of abuse. (Pl. Resp. Statement of Facts ¶ 20).  The police department later informed Doe that no criminal charges would be pursued against Reyes in connection with her allegations of abuse.  (Pl. Resp. Statement of Facts ¶ 24).

## IV.    Procedural History

On October 1, 2009, Doe filed a complaint in the United States District Court for the Northern District of Illinois against the Defendants alleging negligence, fraud, intentional and negligent infliction of emotional distress and negligent hiring, supervision and retention. The case was transferred to this Court on August 18, 2010.   After the case was transferred to this Court, Doe filed an amended complaint, alleging negligence (Count I), gross negligence (Count II), fraud (Count III), violation of the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505 *et seq.* (Count IV), violation of the Massachusetts Consumer Protection Act, M.G.L. c. 93A (Count V), negligent infliction of emotional distress (Count VI) and intentional infliction of emotional distress (Count VII) against the Defendants.  (D. 39).  On November 29, 2010, the Defendants filed a motion for partial summary judgment asking the Court to dismiss certain claims (Counts I, IV, V and VI) arguing that a release provision in the parties' contract barred these claims.  (D. 44).  The Court granted the Defendants' motion in part and dismissed Counts I and VI for negligence and

negligent infliction of emotional distress, respectively. (D. 57). After fact discovery was completed, Defendants moved for summary judgment on the remaining claims. The Court heard oral argument on the motion on August 10, 2011.

## V.      Discussion

### A.      Count I:   Gross Negligence

#### 1.      Standard of Review

In Massachusetts, gross negligence "is an act or omission respecting [the] legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care." Altman v. Aronson, 231 Mass. 588, 591 (1919). It is "substantially and appreciably higher in magnitude than ordinary negligence." Id.; accord Matsuyama v. Birnbaum, 452 Mass. 1 (2008). It is defined as "indifference to a present legal duty and . . . utter forgetfulness of legal obligations so far as other persons may be affected" and "very great negligence, or the absence of slight diligence, or the want of even scant care." Altman, 231 Mass at 591. However, "[i]t falls short of being such reckless disregard of probable consequences as is equivalent to a willful and intentional wrong." Id. In determining whether a defendant's conduct was grossly negligent, the Court considers the defendant's conduct as a whole. Driscoll v. Pagano, 313 Mass. 464, 468 (1943). "Every act or omission . . . must be considered in connection with all the other circumstances before the whole can be properly held to amount to gross negligence." Id.

Causation is an essential element to demonstrate gross negligence. Nna v. Am. Standard, Inc., 630 F. Supp. 2d 115, 132 n. 21 (D. Mass. 2009). Under Massachusetts law, a plaintiff must show not only that the defendant's negligent conduct was the cause-in-fact of the plaintiff's injury, but also that the conduct was the proximate or legal cause of the injury. Staelens v. Dobert, 318 F.3d

77, 79 (1st Cir. 2003) (citing <u>Kent v. Commonwealth</u>, 437 Mass. 312, 320 (2002)).  To demonstrate proximate cause, "a plaintiff must show that his or her injuries were within the reasonably foreseeable risks of harm created by the defendant's negligent conduct."  <u>Id.</u>  The precise harm need not be foreseeable, but the general nature or type of harm must be.  <u>Splaine v. E. Dog Club, Inc.</u>, 306 Mass. 381, 384-85 (1940).  Although the question of "whether a risk of harm was reasonably foreseeable . . . is ordinarily [a matter] for the jury, summary judgment may be appropriate when the evidence and the reasonable inferences drawn therefrom lead to but one conclusion."  <u>Staelens</u>, 318 F.3d at 79 (citing cases and affirming summary judgment in a negligence case).

### 2. Doe Cannot State a Claim for Gross Negligence Under This Standard

Doe alleges in her amended complaint that Cultural Care had a duty to "adequately screen said au pairs, train and supervise said au pairs, and disclose to host families . . . the prior employment experience of said au pairs with its agency."  (Am. Compl. ¶ 29).  Doe does not explain in her amended complaint or motion papers from what law this duty arises and neither party addresses the scope of the legal duty Cultural Care owes Doe as an initial matter.  The Court, however, notes that Doe has earlier in this litigation referred to 22 C.F.R. § 62.31(d)(6) (requiring that au pairs "have successfully passed a background investigation that includes verification of school, three non-family related personal and employment references, a criminal background check or its recognized equivalent and a personality profile"), 22 C.F.R. § 62.31 (l) (regarding the obligation to "fully monitor all au pair exchanges") and 22 C.F.R. § 62.31 (g)(1) (requiring that an au pair receive child safety instruction prior to being placed with a host family) as the source of Defendants' obligations to Doe.  (D. 50 at 8).  Since the Court concludes that the Defendants are entitled to summary judgment because no jury could reasonably find the other requisite elements

of the gross negligence claim in Doe's favor, for the purposes of this motion, the Court assumes, without deciding, that Cultural Care owed Doe a duty of care as alleged in the amended complaint and consistent with the regulatory scheme previously cited by Doe.

### a.     Cultural Care's Alleged Grossly Negligent Acts

In terms of the breach of this duty, Doe alleges that Cultural Care acted with gross negligence or was grossly negligent when it:  (1) failed to adequately screen Reyes for his propensity for violence and/or sexually deviant behavior; (2) failed to conduct a criminal background search; (3) failed to provide Doe with the au pair's two prior host families contact information; (4) failed to disclose to Doe that Reyes has been discharged by two prior host families; (5) failed to disclose that Reyes was a smoker and a drinker; (6) failed to maintain adequate supervision over Reyes; and (7) failed to remove Reyes from Doe's home after she complained.   (Pl. Resp. Statement of Facts ¶ 25).  The Court addresses each of these allegations in turn.

With respect to the allegation of inadequate screening, Doe presents no evidence that Defendants did not properly screen Reyes or that through Cultural Care's screening process, there was any indication that Reyes had any propensity for or had ever engaged in any abusive behavior. Doe also alleges Cultural Care failed to conduct a criminal background search.  The record shows that this allegation is not true; Cultural Care conducted a background check which revealed that Reyes had no criminal record.  (Def. Mot., Ex. 8 (background check document)).[2]

As to the failure to provide the contact information of the two prior host families, Doe had the contact information of at least one of the host families, as evidenced by the fact that she picked

---

[2]At her deposition, Doe claimed that the allegations that Cultural Care failed to conduct a criminal background check "were not [her] allegations" (Doe Tr. 51: 23-52:2) and that she did not know of any facts supporting the allegation that Cultural Care failed to do so.  (Doe Tr. 52: 10-53:1).

up Reyes at that family's home.   Doe hired Reyes the same day she inquired about the program,

after interviewing him by phone and receiving his previous host family's contact information.  (Doe

Tr. 24:6-24; 40:10-43:7).   The failure to provide Doe with the other host family's information or

failing to inform Doe that Reyes had been discharged by two prior host families simply does not

demonstrate the requisite indifference or "the want of even scant care," <u>Altman</u>, 231 Mass at 591,

required to establish gross negligence.[3]  Moreover, the exit interviews of the two prior host families

did not reveal that Reyes had a propensity for violent or abusive behavior towards the children in

those families.  The same is true as to the Defendants' alleged failure to inform Doe that Reyes was

a smoker or drinker prior to hiring him.

Defendants' alleged failure to supervise Reyes also does not amount to a breach of Cultural

Care's duty or deliberate indifference to a legal duty sufficient to establish gross negligence.  Under

the host family agreement, Cultural Care is not charged with "supervision" of the au pair.  Pursuant

to the agreement Doe signed to engage Reyes as her au pair, Cultural Care has no "dominion or

control" over the au pair and that the au pair is not an "employee, servant or agent" of Cultural Care.

(Def. Mot. for Partial Summary Judgment, Ex. 3 (Host Family Agreement, ¶ 15)).[4]  The agreement

---

[3]To the extent that Doe also claims (and the Defendants dispute) that she was rushed into completing the information on Cultural Care's website by Strobel who repeatedly told her that if she did not quickly complete the application, it would take months before Cultural Care could find her another au pair, such allegation does not warrant denial of summary judgment since it does not constitute evidence of the Defendants' requisite indifference.

[4]Pursuant to the host family agreement, the host agrees that "the au pair will perform childcare services and light housekeeping duties related to childcare" (Host family agreement ¶ 6), that "during the first three (3) days of an au pair's stay in the home, a parent or other responsible adult shall remain in the home to facilitate the adjustment of the au pair into the family, household and community" (Host family agreement, ¶ 13) and that the "au pair is not an employee, servant or agent of CC, and that CC does not exercise dominion or control over the actions of the au pair. . . ." (Host Family Agreement, ¶ 15).

further provides that "it is the Host's sole responsibility to thoroughly interview and carefully choose an au pair from the candidate(s) presented to the Host, and that there is no warranty as to the Host's satisfaction or to the compatibility of any particular candidate as an au pair in [the] Host's family," (Host Family Agreement ¶ 4), that the host is responsible for paying a stipend to the au pair, providing appropriate board and lodging, (Host Family Agreement ¶ 5), and paying for certain expenses incurred by the au pair.  (Host Family Agreement ¶ 9).

Finally, Doe contends that Cultural Care should have removed Reyes after she complained about his smoking and drinking.  Doe argues that Cultural Care should have begun the two-week transition period to remove Reyes from Doe's residence once she informed them that Reyes was a smoker and a drinker on November 3, 2007, particularly in light of her request at the time she completed the host family application that the au pair not smoke or drink.  (Hearing Tr. 26:16-25). Although Doe requested that Reyes be removed because of his smoking and drinking on November 3, 2007, the record shows that Doe neither objected to Reyes staying in her home during the transition period nor objected to Parris' request to give her time to work with Reyes.  (Pl. Ans. to Strobel Int. ¶ 13).

Doe further argues that Cultural Care should have removed Reyes on December 3, 2007, when Doe informed the agency of Reyes' comment to John Doe that he was going to kill himself. However, as of December 3, 2007, Doe had already indicated that she wanted to terminate Reyes for different reasons and Doe and Cultural Care were in the two-week transition period to do so. The failure to remove Reyes immediately when Cultural Care was already in the process of doing so does not constitute the requisite level of indifference to support a claim of gross negligence.  See Driscoll, 313 Mass. at 468 (noting that a "high degree of culpability and indifference to duty [ ] is

the essential characteristic of gross negligence"); <u>Cutts v. Dennehy</u>, 2010 WL 1325465, at *6 (D. Mass. Mar. 31, 2010) (granting summary judgment for defendants who plaintiff alleged were grossly negligent in failing to take affirmative actions to prevent danger to the plaintiff and because the record was devoid of evidence that defendants were or should have been aware of any dangerous conditions at a prison, or that they acted with callous indifference to the plaintiff's rights).

        **b.**       **Causation**

        This Court is acutely aware that Doe makes serious allegations about Reyes' conduct and the impact of the alleged sexual abuse on her young son. Defendants hotly contest the allegations of sexual abuse by Reyes, but stress that the Court need not resolve this dispute to grant summary judgment in their favor. (Def. Memo at 9). The Court agrees as to this latter point. That is, even if the Court accepts as true Doe's allegations about sexual abuse by Reyes and accepts that all of the conduct or omissions discussed above constituted breaches of Cultural Care's duty to Doe, it cannot be said that Defendants' conduct or omissions were the actual or proximate cause of such alleged abuse. Doe has not demonstrated that Defendants' alleged failure to act in a certain way or their alleged misrepresentations, omissions caused the type of harm suffered by John Doe. Nor could a jury conclude that it was reasonably foreseeable- i.e., that Defendants knew or should have known - that John Doe would be abused as a result of Defendants' conduct and that Defendants were therefore grossly negligent in placing Reyes in, and not removing him earlier, from Doe's residence. Doe offers only the following evidence to show proximate cause for the alleged harm: that Defendants neither disclosed that Reyes was a smoker and drinker nor shared exit interview notes from previous host families that described Reyes as immature and un-nurturing, and revealed that he had teased one child of a prior host family; and a comment Reyes allegedly made to John Doe

12

that Reyes was going to kill himself that was promptly reported by Doe to Cultural Care.

Neither Reyes' alleged comment to John Doe nor the exit interview notes can reasonably be said to put Defendants on notice that Reyes would sexually abuse John Doe.   Even assuming Reyes teased the children of the first host family and was immature and did not nurture the children of the second host family, it is unreasonable to conclude that such conduct put Defendants on notice that Reyes would subject John Doe to abuse.   To find otherwise would be to "substantially extend the scope of reasonable foreseeability as set forth in Massachusetts case law and stretch the concept beyond reason . . . ." Staelens, 318 F.3d at 79; see Woods-Leber v. Hyatt Hotels of P.R., Inc., 124 F.3d 47, 51-52 (1st Cir. 1997) (affirming summary judgment where district court found that defendant could not reasonably have expected to foresee an animal attack on a guest of its hotel and that defendant had no knowledge, actual or constructive, of the animals' existence or of the incipient danger they presented).   Likewise, it cannot be said that the comment Reyes allegedly made to John Doe about planning to kill himself made it reasonably foreseeable that Reyes would sexually abuse John Doe.[5]   "There must be limits to the scope or definition of reasonable foreseeability based on considerations of policy and pragmatic judgment." Poskus v. Lombardo's of Randolph, Inc., 423 Mass. 637, 640 (1996); see also Kent, 437 Mass. at 320-21.   Similarly, even if Strobel had

---

[5]As an initial matter, Doe's testimony attesting to a comment Reyes made to John Doe constitutes hearsay.  Doe offers this testimony to prove the truth of the matter asserted; that is, that Reyes would kill himself and that as a result, Cultural Care should have known that Reyes posed a danger to himself or others and should have promptly removed him from Doe's home.  It is well-settled that hearsay evidence, inadmissible at trial, cannot be considered on summary judgment.  See, e.g., Davila v. Corporación De P.R. Para La Difusión Publica, 498 F.3d 9, 17 (1st Cir. 2007).  Doe does not assert that the statement is excluded from the operation of the hearsay rule by any exception.  Even assuming a hearsay exception applied, it cannot be said that it was reasonably foreseeable that Defendants' failure to remove Reyes from Doe's residence after she complained about the comment would create a risk that Reyes would be sexually abusive.

knowledge that Reyes was a smoker and drinker and failed to disclose this information to Doe, Defendants could not have been expected to  foresee that a person who smokes or drinks would sexually abuse a child.  Doe has neither offered evidence to the contrary nor demonstrated that a trier of fact could reasonably resolve this issue in her favor.

It is Doe's burden to "'establish a causal connection between the [gross] negligence of Defendants and any damages . . . suffered.'"  Sattler v. Wild Acre Inns, Inc., 69 Mass. App. Ct. 1103, at *1 (Table) (2007) (quoting Glicklich v. Spievack, 16 Mass. App. Ct. 488, 492 (1983)). Doe has simply failed to demonstrate that Defendants' conduct was "more probably than not" a cause of the type of harm John Doe suffered.  Id.  A jury could not reasonably conclude on the present record that Defendants knew or should have known that Reyes would abuse John Doe to be liable for gross negligence.

Accordingly, considering the facts of this particular case and the record as a whole, no reasonably jury could conclude that the alleged abuse was within the reasonably foreseeable risk of harm created by Defendants' conduct to constitute gross negligence.  Defendants are therefore entitled to summary judgment with respect to Count II.

### B.    Count III:   Fraud

To prove fraud a plaintiff must show that "the defendant 'made a false representation of material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the representation as true and acted upon it to his damage.'"  Taylor v. Am. Chemistry Council, 576 F.3d 16, 31 (1st Cir. 2009) (quoting Russell v. Cooley Dickinson Hosp., Inc., 437 Mass. 443, 458 (2002)).

Doe cannot and has not satisfied this test.  She has presented no evidence to show that at the

time Strobel told her that Reyes was not a "smoker or drinker," that Strobel knew that this was

untrue.  Similarly, Doe's reliance on this statement and on exit interviews from prior host families

to show that Reyes was accused of teasing a child and of being immature is misplaced since she

produces no evidence that the Defendants knowingly withheld this information nor any evidence

that Defendants intended that Doe would rely on the absence of that information in making her

decision to participate in the program.  Doe argues that a reasonable jury could find that the failure

of Pernilla Summer, Program Director assigned to Reyes' first host family, (Pl. Statement of Add.

Facts ¶¶ 3-4), to input these exit interview notes about Reyes' behavior into the database was

"calculated" to make him appear to be a viable au pair candidate, when he was not.  (Pl. Opp. at 7).

The suggestion that the exit interview notes were not entered into the database purposefully, with

the intention of concealing their contents from Doe to induce her to rely on the omission of it, is

unsupported by any evidence in the record and amounts to mere speculation and conclusory

allegations.  "[C]onclusory allegations, improbable inferences, and unsupported speculation" are

insufficient to avoid summary judgment.  DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005).

Doe's counsel's citation to Strobel's testimony at oral argument that Strobel could have retrieved

additional information about Reyes after speaking to Doe  (Hearing Tr. 33:25-34:4) does not alter

the Court's analysis since Doe has produced no evidence that at the time Strobel spoke to Doe about

engaging Reyes, she knowingly concealed the content of the exit interview notes regarding the

families' experiences with him.[6]

---

[6]The other evidence Doe has cited to support her fraud claim, namely, a copy of the
"About Us" page from Cultural Care' website and copies from pages from three different
websites showing complaints from unknown individuals about their experiences with Cultural
Care,  (Pl. Ans. to Cultural Care's Int. ¶ 11), is of no aid to Doe.  Doe has not explained (either in
her deposition or motion papers)  how these documents show that Defendants made a false
representation for the purpose of inducing her to hire Reyes as her au pair.

In addition, even assuming the materiality of the fact that Reyes had been discharged by two prior host families, Doe has offered no evidence that when Strobel told her that Reyes had only been with one prior host family, that Strobel concealed that Reyes had been with another prior host family with the purpose of inducing Doe to participate in the au pair program.[7]

Doe also contends that Strobel falsely represented that Reyes was an "excellent kid." Strobel's statement that he was an "excellent kid" is a statement of belief or opinion that does not constitute a statement of fact for purposes of fraud. <u>Neuro-Rehab Assocs., Inc. v. Amresco Commercial Fin.</u>, LLC, 2009 WL 649584, at *22 (D. Mass. Mar. 12, 2009) (noting that "[s]tatements of opinion or predictions about future events ordinarily cannot be the basis for a claim of fraud or intentional misrepresentation"). Although under certain circumstances "statements of opinion [or] belief . . . may be actionable" where the speaker knows such statement is false when it is made, <u>In re Access Cardiosystems, Inc.</u>, 404 B.R. 593, 642 (Bankr. D. Mass. 2009), such is not the case here. Accordingly, Defendants are entitled to summary judgment as to the fraud claim in Count III.

### C.   Count IV:   Illinois Consumer Protection Statute

The Illinois Consumer Protection Act ("ICPA"), 815 Ill. Comp. Stat. § 505/2, provides:

> Unfair methods of competition and unfair or deceptive acts or
> practices, including but not limited to the use of employment
> of any deception, fraud, false pretense, false promise,

---

[7] Strobel's alleged statement that it would take six months to a year to find a new au pair does not show that Strobel misled Doe to induce her to engage Reyes as her au pair at that moment. Assuming Strobel stated, according to Doe's testimony, that it would take six months to one year, (Doe Tr. 36: 8-15), Doe acknowledged the extent of the lengthy process in her testimony, stating that Strobel told her that "the Visa process takes very, very long since 9/11." (Doe Tr. 37:2-7). The fact that Doe could not or did not want to wait up to six months for Cultural Care to find her a new au pair does not make Strobel's conduct actionable, even assuming, as Doe claims, that Strobel had a financial incentive for Doe to select Reyes.

> misrepresentation or the concealment, suppression, or
> omission of any material fact, with intent that others rely upon
> the concealment, suppression or omission of such material fact
> . . . in the conduct of any trade or commerce are hereby
> declared unlawful whether any person has in fact been misled,
> deceived or damaged thereby.

To establish a claim under the Illinois Consumer Protect Act, a plaintiff must show: "(1) a deceptive act or unfair practice occurred, (2) the defendant intended for plaintiff to rely on the deception, (3) the deception occurred in the course of conduct involving trade or commerce, (4) the plaintiff sustained actual damages, and (5) such damages were proximately caused by the defendant's deception." Hardaway v. CIT Group/Consumer Fin. Inc., 2011 WL 3296825, at *6 (N.D. Ill. Aug. 1, 2011) (citation omitted); Oshana v. Coca-Cola Co., 472 F.3d 506, 513 (7th Cir. 2006). "Illinois courts determine if acts or practices are deceptive by examining whether the statements at issue created a likelihood of deception or had the capacity to deceive." In re Mut. Life Ins. Co. of N.Y. Premium Litig., 295 F. Supp. 2d 140, 147 (D. Mass. 2003) (citing Bober v. Glaxo Wellcome PLC, 246 F.3d 934, 938 (7th Cir. 2001)). "An omission or concealment of a material fact in the conduct of trade or commerce constitutes consumer fraud." Pappas v. Pella Corp., 363 Ill. App. 3d 795, 799 (2006) (citing Connick v. Suzuki Motor Co., 174 Ill.2d 482, 504 (1996)). A plaintiff must show that the defendant's conduct was the proximate cause of her injury. Oshana, 472 F.3d at 513; White v. DaimlerChrysler Corp., 856 N.E.2d 542, 549 (Ill. App. Ct. 2006).[8]

Under the circumstances, even assuming that a reasonable jury could find that deception occurred here, it could not reasonably conclude that the deception was the cause of the harm allegedly suffered by John Doe and Doe herself. As explained above, Doe offers no evidence that

---

[8]At oral argument, counsel for Doe represented that proximate cause between the Defendants alleged actions and the alleged harm is a requirement to state a claim under the ICPA and M. G. L. ch. 93A.

Strobel knew but failed to disclose to her the contents of the exit interviews of Reyes' two prior host families.  Even if Strobel knew this information and failed to disclose it in addition to failing to disclose that Reyes had been discharged by two previous host families, such failures did not cause John Doe to be abused and did not make it reasonably foreseeable that the alleged sexual abuse would occur.  Doe has simply offered no evidence from which a reasonable jury could find that the alleged deceptive conduct was the proximate cause of the harm alleged to sustain a claim under the ICPA.  Thus, Defendants are entitled to summary judgment as to Count IV.

### D.      Count V:   Mass. Gen. Laws ch. 93A

Section 9 of Chapter 93A provides a private cause of action for "any person ... who has been injured by another person's use or employment of" an unfair or deceptive act or practice.  Mass. Gen. Laws ch. 93A, § 9 (2004).  "Chapter 93A punishes 'unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.'"  Lechoslaw v. Bank of Am., N.A., 618 F.3d 49, 58 (1st Cir. 2010) (quoting Mass. Gen. Laws ch. 93A, § 2(a)).   An act is "deceptive" under 93A if "it could reasonably be found to have caused the person to act differently from the way [she] otherwise would have acted." Tagliente v. Himmer, 949 F.2d 1, 7 (1st Cir. 1991) (citing cases).

To recover under Mass. Gen. Laws ch. 93A, § 9, a plaintiff must establish that:   (1) the defendant committed an unfair or deceptive act or practice; (2) the plaintiff suffered an injury or loss; and (3)  the defendant's unfair or deceptive act or practice caused the injury suffered.  Herman v. Admit One Ticket Agency LLC, 454 Mass. 611, 615-16 (2009).  The amended complaint alleges that Defendants violated ch. 93A by "engaging in a pattern and practice of inadequate screening, concealing problems with au pairs and making knowing or willful misrepresentations concerning

the circumstances surrounding the separation of au pairs from prior host families."  (Am. Compl. ¶ 47h), but as explained above, Doe has failed to show that Defendants' conduct including the alleged misrepresentations or omissions caused the harm allegedly suffered by John Doe.  Summary judgment is therefore granted in Defendants' favor as to Count V.

### E.        Count VII:   Intentional Infliction of Emotional Distress

In Massachusetts, to establish a claim for intentional infliction of emotional distress, a plaintiff must show that:   "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was 'extreme and outrageous'; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was 'severe' and of a nature that no reasonable man could be expected to endure it."  Agis v. Howard Johnson Co., 371 Mass. 140, 144-45 (1976) (internal citations omitted).  Extreme and outrageous conduct is "conduct [that is] beyond all bounds of decency and utterly intolerable in a civilized community."  Fredette v. Allied Van Lines, Inc., 66 F.3d 369, 374 (1st Cir. 1995).  "The standard for making a claim of intentional infliction of emotional distress is very high. . . ."  Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996).  The First Circuit has explained that "[r]ecovery on such a claim requires more than that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort."  Id. at 195 (internal quotation marks and citation omitted).

Here, Doe cannot satisfy the first requirement to state an intentional infliction of emotional distress claim since she has presented no evidence from which a reasonable jury could conclude that

the Defendants intended to inflict emotional distress upon her.   The record shows only Doe's conclusory allegation that the Defendants intended its conduct to cause severe emotional distress upon Doe and her son; the record is devoid of any evidence raising a genuine factual dispute on the question of intent.  See Godbout v. Cousens, 396 Mass. 254, 264-65 (1985) (affirming summary judgment on intentional infliction of emotional distress claim where plaintiff offered no evidence to create a genuine dispute as to defendants' intent).

Nor can Doe meet the second requirement.  The misrepresentations and omissions alleged by Doe do not approach the necessary level of extreme and outrageous conduct courts have found to be "beyond all bounds of decency" and which are "utterly intolerable in a civilized community." See Simon v. Solomon, 385 Mass. 91, 96-98 (1982) (holding that a landlord's indifference, over a period of years, to repeated floodings of the plaintiff's basement apartment with sewage amounted to extreme and outrageous conduct); Bowman v. Heller, 420 Mass. 517, 522 n. 6 (1995) (affirming that defendant's act of creating and distributing photocopies of another co-worker's face superimposed on photographs of women in pornographic poses was extreme and outrageous). Contrast Conley v. Romeri, 60 Mass. App. Ct. 799, 804-805 (2004) (finding that defendant's conduct was not outrageous when holding himself out as capable of fathering children to induce sex); Lockhart-Bembery v. Town of Wayland Police Dept., 404 F. Supp. 2d 373, 377 (D. Mass. 2005) (finding that police officer's conduct in insisting the motorist push her inoperable car off the road without his assistance was not extreme and outrageous).   Considering the undisputed facts of this case, no reasonable jury could conclude that Defendants engaged in such extreme and outrageous conduct for Doe to prevail on a claim of intentional infliction of emotional distress. Accordingly, Defendants are entitled to summary judgment as to Count VII.

## VI.   Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge